IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAVARIUS WARE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No.  05 C 424 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| JEWEL FOOD STORES, INC., ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Tavarius Ware filed a three-count amended complaint against defendant Jewel Food Stores, Inc. ("Jewel") under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), alleging: failure to accommodate (Count I); unlawful termination based on disability (Count II); and unlawful termination based on plaintiff's history of disability (Count III). Defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56(c). For the reasons set forth below, defendant's motion is granted.

## **FACTS**[1]

Background

Plaintiff began working for defendant on July 17, 1995, as an assembler (order selector) in defendant's Melrose Park, Illinois, distribution center. At the beginning of his employment, all assemblers were members of the Chicago Truck Drivers, Helpers and Warehouse Workers

---

[1] Unless otherwise noted, the facts are taken from the parties' L.R. 56.1 statements and attached exhibits.

Union. The terms of assemblers' employment were governed by a collective bargaining agreement ("CBA") between defendant and the union.[2] Plaintiff's position required him to select boxes of merchandise, which weighed an average of twenty-five pounds each, from storage shelves and stack those boxes on pallets. Plaintiff would then use a motorized pallet truck to move the boxes on pallets to the loading dock for shipment to various retail outlets in the Chicago area.

When plaintiff began working for defendant as an assembler, the assignments for assemblers were produced by a computerized system, "GAGNON," which also provided time limits within which an assembler was required to complete each job. These time limits varied based on the size of the order, the size of the store placing the order, and whether the items in the order were "on sale." Assemblers obtained their assignments from an allocation office. Once an assembler finished his assignment, he would return to the office for another. According to plaintiff, when he first began working for defendant, the assignments were generally given out in the order issued by the computer system, but if an assembler had just finished a large assignment, the allocation clerk would next assign him or her a lighter order.

Defendant later changed its allocation practice and generally required assemblers to take assignments in the order produced by the computer system, although allocation clerks did occasionally make exceptions for large or heavy orders. On one occasion, a supervisor named Larry Magner gave plaintiff a lighter assignment, rather than the assignment given by the

---

[2] On December 18, 2000, the members of the Chicago Truck Drivers, Helpers and Warehouse Workers Union voted to join Local 710 of the International Brotherhood of Teamsters, but the original CBA remained in effect throughout plaintiff's employment.

2

computer system. Plaintiff maintains that he was generally able to finish his assignments before the time limit had run, giving him a brief rest before he began his next assignment. At the end of the work day, if an assembler had only a short time left to complete his shift, the allocation clerk on duty would find a "short assignment" so that the assembler could complete an order without working overtime, which required the allocation clerk to give assignments out of the order generated by the computer system.

In 1995, defendant converted from the "GAGNON" system to the "DALLAS" warehouse management system, which configured pallets differently. This system required assemblers to work throughout the warehouse, rather than in only one section. According to defendant, assignments were distributed to assemblers in the order printed by the "DALLAS" system, with no exceptions. In 2001, defendant converted the warehouse to a conveyer belt system. Defendant assigned assemblers to work on the conveyer belt system based on seniority. Plaintiff worked on the system five to ten times.

Plaintiff's Injuries

On January 24, 1997, plaintiff injured his back while lifting a case of bleach in defendant's warehouse, and he was taken by ambulance to the emergency room. Plaintiff submitted to defendant a report from the hospital that described his condition as "lumbar strain" and prohibited him from lifting more than one to two pounds. Plaintiff also gave defendant two additional notes from a doctor indicating that he had injured his back and could not work. The injury caused acute pain in plaintiff's lower back, which made him unable to bend, walk, sit, or stand. After treatment and rest, plaintiff returned to work on February 18, 1997 with no

limitations to perform his daily activities. On April 16, 1998, plaintiff again injured his lower back while moving furniture at home. Plaintiff submitted a disability absence report to defendant. Again, plaintiff was unable to bend, walk, sit, or stand without severe pain; with treatment and rest, he was able to resume his activities.

On August 5, 1998, plaintiff injured his back while performing work at defendant's warehouse. Plaintiff was taken by ambulance to the emergency room. He attempted to return to work on two occasions, but he was unable to work for more than two days before his back pain forced him to stop. Plaintiff then underwent an MRI, which revealed a herniation of lumbar vertebrae. His physician told him that only surgery could correct his condition, but plaintiff instead chose epidural cortisone injections and physical therapy. Plaintiff's physician informed him that continued heavy lifting would aggravate his back injury until he was incapacitated. Defendant required plaintiff to obtain a second diagnosis by a doctor of its choosing. On October 28, 1998, plaintiff was examined by Dr. Theodore Suchy, D.O., who reported to defendant that plaintiff's MRI revealed a herniated disk and that plaintiff's August 5 lifting injury was the cause of his lumbar strain. He told defendant that plaintiff may have "reoccurrences of the lumbar myositis [inflammation]," but that plaintiff could return to work and had reached "maximal medical improvement." Plaintiff's own physician recommended against his return to work, and plaintiff did not report to defendant's warehouse. Defendant discharged plaintiff, but reinstated him. Plaintiff submitted an Employee Accident Statement to defendant concerning the August 5, 1998 back injury. Plaintiff also submitted disability absence reports and filed a claim for worker's compensation benefits, which he settled with defendant.

The Settlement Contract states that plaintiff suffered a herniated disk and "7% loss of man as a whole."[3] Plaintiff did not return to work until December 7, 1998.

On January 22, 2000, plaintiff suffered a non-work-related lumbar strain. Plaintiff submitted a disability absence report and notes from his physician indicating that plaintiff had a "herniated lumbar disk now with sciatica of right leg." According to plaintiff, he had acute pain in his lower back and could not bend, walk, sit, or stand. Once again, plaintiff recovered his ability to perform these activities after treatment and rest. He returned to work on February 21, 2000.

On July 16, 2000, plaintiff again suffered a non-work-related back injury. He submitted disability absence reports indicating that he had "low back strain," and he provided a note from his physician and a Report of Attending Physician stating that he had back strain with sciatica and could not do any carrying, bending, or lifting. Plaintiff was gradually able to resume these activities after treatment and rest, but he experienced problems with repetitive heavy lifting. Plaintiff was on medical leave from July 17, 2000 to August 7, 2000.

On September 20, 2000, plaintiff experienced sharp pain in his back while on the job. Plaintiff was taken by ambulance to the emergency room, where a CAT scan revealed a "chronic appearing L4-5 disc herniation." A medical report submitted to Kemper Insurance, defendant's third-party administrator for work-related injuries, stated that a bone scan showed inflammation of plaintiff's tibia. Reports from plaintiff's doctor stated that he questioned whether plaintiff's

---

[3] The court notes that defendant denies that the Settlement Contract states that plaintiff suffered "7% loss of man as a whole." Defendant provides no support for its claim, and the Settlement Contract does, in fact, contain this statement.

5

job duties were "too much of a strain on his lower back and knees" and that plaintiff "continue[d] to have a herniated lumbar disc which could at any time become worse." Another MRI showed plaintiff's disc hernation, and an attached report stated that "there may be nerve impingement on the transversing S1 nerve root, especially on the right side." Plaintiff submitted numerous documents to defendant concerning the September 20 injury. Plaintiff then filed a worker's compensation claim, which he settled with defendant. According to plaintiff, after the September 20 injury, he could not bend, walk, sit, stand, or engage in sexual relations. He regained his ability to engage in these activities with treatment and rest, but only with permanent limitations. Plaintiff returned to work on December 19, 2000.

Plaintiff was on medical leave from March 1, 2001, to May 1, 2001, due to a work-related knee injury. Plaintiff's doctor stated that he could return to work on May 1 with no restrictions.

On August 24, 2001, plaintiff suffered lower back pain at home. He submitted multiple disability absence reports and a report from his physician stating that he suffered "low back strain related to repetitive heavy lifting on the job." Plaintiff encouraged his physician to lift his work restrictions so he could return to work; his physician told him to "ease up on the heavy lifting" and suggested that he find "some other job...that won't be as severe." Although plaintiff returned to work on October 1, 2001, his back pain continued; plaintiff suffered episodes of acute lower back pain on February 4, April 29, June 13, July 9, and August 17, 2002. Each time, plaintiff submitted disability absence reports and documentation from physicians.

Plaintiff was on medical leave from January 1, 2002 to January 28, 2002 because of a non-work-related ankle injury. He was on medical leave from April 29, 2002 until May 14,

2002 because of a sore back. Plaintiff states that when he returned to work, he could not: (a) engage in repetitive heavy lifting; (b) walk for more than two blocks without stretching; (c) stand in one spot for more than ten minutes; (d) sit in one position for more than thirty minutes; (e) engage in sexual intercourse more than two times per week for twenty minutes at a time; (f) wrestle with or pick up his children; (g) sleep without repositioning himself every three to five hours; or (h) engage in some social situations because he was "gloomy."

On August 28, 2002, plaintiff injured his ankle at work and was placed in a temporary light duty position from August 29, 2002 to September 6, 2002. Plaintiff took medical leave from October 1, 2002 to October 7, 2002 because of a work-related shoulder injury. When he returned, defendant placed him in a light duty position until October 21, 2002.

At the time of discharge in December 2002, plaintiff states that he was limited in his ability to perform daily activities in the following manner: (a) he could "walk a couple of blocks," but then needed to sit down or rest; (b) he could stand in one spot for ten minutes, but then had to sit down or lean against a wall; (c) he could sit in one position for twenty minutes, but then had to adjust his position or stand up for a few minutes; (d) he could not do the "Twist"; (e) he had to take more showers than baths; and (f) he could engage in sexual intercourse two times per week for thirty minutes at a time, but could not engage in some sexual positions.

According to plaintiff, although he suffered numerous episodes of back pain and was taken from the warehouse by ambulance several times, his supervisors told him in 2002 that "nobody cares, because we know you're faking your injuries." In 2000 or 2001, Dermot Ryan, a line supervisor, told plaintiff that defendant was "targeting" him for discipline because plaintiff was "always off work" and "always hurt." Additionally, Jerome Jackson, a former supervisor of

plaintiff, told plaintiff that other supervisors wanted to terminate plaintiff because his injuries made him a liability. Jackson also told plaintiff to "watch out" because "they talked about you in a meeting."

Plaintiff's Requests for Accommodation

In 1999, plaintiff began asking his supervisors for accommodations for his back problems and continued to do so through the second half of 2002. According to plaintiff, he approached a total of eleven supervisors. He requested two types of accommodation: (1) fewer back-to-back large or heavy orders; and (2) forklift training to avoid heavy lifting. Each time plaintiff made a request, he specified that he had a back problem. Supervisors continually denied plaintiff's requests to deviate from the computer-generated assignment system to provide him with lighter loads. Supervisor Charles Grafton told plaintiff, "[E]verybody's got a back problem...[w]e just can't...do something for you and not for anybody else." He also told plaintiff, "[You] have to take the assignments as they come." However, two other assemblers, Bob Tisco and Steve Bach, had weight restrictions placed on their assignments, because both men had suffered injuries that prevented them from lifting heavy objects. According to defendant, Tisco and Bach were assigned to particular warehouse aisles with lighter boxes, and the allocation clerk on duty would find lighter assignments for Tisco and Bach.[4]

Plaintiff asked supervisor Thomas Kordas, among others, for forklift training so that he would not have to lift heavy boxes. Only employees with 80% seniority status were eligible for

---

[4] Bach resigned from Jewel in November 1997, and Tisco bid into a receiver position, which did not entail heavy lifting, in December 1999.

8

forklift work. Plaintiff attained 80% seniority status on June 4, 2001, but he did not receive forklift training until approximately ten months later. Defendant maintains that plaintiff did not receive training earlier because it conducts forklift training infrequently, and plaintiff worked full days on Monday through Thursday only five times from June 4, 2001, to April of 2002 when he received his training. Plaintiff was absent for all other forklift training sessions. During that year, employees with less seniority than plaintiff received forklift training and completed forklift assignments. According to plaintiff, when he asked Kordas for forklift training, Kordas told him that he should get another job.

Plaintiff's Discipline Record

From December 1995 through November 2002, plaintiff received fifty-nine warnings for poor attendance. Plaintiff asserts that some of these warnings were for illness-related absences. From 1996 through 2000, plaintiff was disciplined five times for poor performance, including two warnings for "mispicks," meaning he had incorrectly selected merchandise for loading. In 2001, plaintiff was disciplined twelve times for poor performance, including three warnings for mispicks and a one-day suspension for mispicks. Plaintiff denies that discipline was warranted, but he admitted in his deposition that: (a) his work machine was parked improperly; (b) he had "wrong stickers on the wrong cases"; (c) it "could have been possible" that he had mispicks; (d) he had "two mispicks"; (e) he had "mistakenly" keyed in an order; and (f) he used a cell phone on the warehouse floor in violation of defendant's policy.

On May 30, 2002, plaintiff received an indefinite suspension based on two mispicks and a Loader's report that two pallets were missing from an order that had been assigned to plaintiff.

9

Plaintiff denies making these mistakes, but admits that he was caught sleeping on the job and did not remember whether he failed to use proper keying procedures. On June 6, 2002, plaintiff, defendant and the union signed a letter of "conditional employment" effective until June 6, 2003. The letter stated that any future major mispicks by plaintiff would result in his immediate termination. Plaintiff denies any performance problems and maintains that he was forced to sign the letter.

On September 30, 2002, plaintiff received a one-day suspension for mispicks. Plaintiff denies that he had a mispick on that day. In October and November 2002, plaintiff was disciplined three times for performance issues, all of which plaintiff denies.

On December 12, 2002, plaintiff mispicked eleven boxes in one assignment, nine boxes in a second assignment, and five boxes in a third assignment. Plaintiff asserts that he was completing assignments that day for which he had received no training. Supervisor Charles Grafton immediately suspended plaintiff indefinitely, and Director Kevin Durkin decided to terminate plaintiff. On December 19, 2002, Grafton met with plaintiff and his union representative to deliver the termination decision. During that meeting, plaintiff told Grafton that he had been diagnosed the previous day with an eye condition which caused his vision to be "wavy," which he believed was the reason for his mispicks. Durkin determined that plaintiff's termination would stand. Plaintiff maintains that during the month he was terminated, another employee with no disability had 300 "mispicks" in one order and was not terminated.[5] On

---

[5] Defendant maintains that it issued that employee a formal warning on May 9, 2003.

December 30, 2002, plaintiff filed a grievance relating to his discharge. On February 7, 2003, the Joint Grievance Committee upheld plaintiff's discharge.

Plaintiff's Medical Condition Since Discharge

Plaintiff's back pain has continued since his termination by defendant, although with less frequency. He received medical treatment in August, October, and December of 2003, as well as September of 2005. On December 20, 2003, an MRI showed "some disc bulging but no evidence of pressure on nerves or spinal cord." An EMG performed on March 16, 2004 showed "no evidence of a pinched nerve" and "no definite electro-physicologic evidence of lumbosacral radiculopathy."

Since 2004, plaintiff has operated a seasonal car wash. Since September 2005, he has also been self-employed as a distributor of dietary supplements. He can perform, without accommodation: (a) "warehouse work" that does not require "much heavy lifting"; (b) a "forklift job"; and (c) work that involves, sitting, standing, and walking, so long as he does not have to engage in any one activity for "a long time."

## DISCUSSION

Under Fed. R. Civ. P. 56(c), a court should grant a motion for summary judgment if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of material fact. See Celotrex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

Counts II and III: Discriminatory Termination

Counts II and III allege discrimination based on disability in violation of the ADA. Count II alleges termination based on plaintiff's disability, and Count III alleges that plaintiff was discharged because defendant regarded him as having a disability.[6] Because plaintiff presents no direct evidence of discrimination, plaintiff must rely on the burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this method, plaintiff must establish a prima facie case of disability discrimination. The burden then shifts to defendant to present a legitimate, non-discriminatory reason for plaintiff's adverse employment action. If defendant can present such a reason, the burden shifts back to plaintiff to present evidence that the employer's proffered reason is pretextual. Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir. 1998).

---

[6] Count III alleges "Unlawful Termination Based on History of Disability," but the text of the complaint alleges that defendant discriminated against plaintiff because it regarded him as having a disability. The court will therefore analyze Count III under both theories.

12

To establish a prima facie case of discrimination based on disability, plaintiff must establish: (1) that he has a disability within the meaning of the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. Rooney v. Koch Air, LLC, 410 F.3d 376, 380-81 (7th Cir. 2005). Defendant argues that plaintiff has failed to establish elements one, two, and four of his prima facie case.

Under the ADA, an individual has a disability if he: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). The EEOC has defined major life activities to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Plaintiff's back problems constitute an impairment under the ADA. His prima facie case fails, though, because he cannot demonstrate that he was substantially limited in any major life activity. Plaintiff claims that he was substantially limited in his ability to sit, stand, walk, engage in sexual relations, and work. Plaintiff's limitations, though, were sporadic; each time he injured his back, he was limited in his ability to perform these activities for no more than several weeks. "Disability does not include temporary medical conditions." Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999). A condition is "temporary" if it lasted more than five months. Id. at 482. Because plaintiff's injuries limited him for no more than a few weeks at a time, the court concludes that plaintiff was not substantially limited in any major life activities because his condition was temporary.

Even assuming that plaintiff's condition was not temporary, however, the extent to which he was limited in each major life activity still does not rise to the level of "substantial" as required under the ADA. As he stated in his deposition, plaintiff was able to sit in one position for twenty to thirty minutes. His ability to do so demonstrates that he is not substantially limited in his ability to sit. See, e.g., Helfter v. United Postal Service, 115 F.3d 613, 616 (8th Cir. 1997) (the ability to sit for no longer than thirty minutes in one position did not rise to the level of a "substantial limitation"). Similarly, plaintiff's ability to walk several blocks before resting does not render him substantially limited in his ability to walk (see, e.g., Bond v. Sheahan, 152 F. Supp. 2d 1055, 1067 (N.D. Ill. 2001)), and the ability to stand in one spot for only ten minutes does not substantially limit his ability to stand. See, e.g., Colwell v. Suffolk County Police Dept., 158 F.3d 635, 644 (2nd Cir. 1998). Additionally, the Seventh Circuit does not recognize engaging in sexual relations as a major life activity. Contreras v. Suncast Corp., 237 F.3d 756, 764 n. 6 (7th Cir. 2001).

Plaintiff also asserts that he was substantially limited in the major life activity of working. To prevail on this claim, plaintiff must allege, "at a minimum" that he is "unable to work in a broad class of jobs." Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999). Plaintiff has not alleged that he was unable to perform a class or range of jobs; instead, he alleges only that he could not perform his own job without an accommodation. Plaintiff is therefore not substantially limited as to working or any other major life activity.

Plaintiff may still qualify as an individual with a disability if he can demonstrate that he had a record of a disability or his employer regarded him as having a disability. To succeed under a theory of having a record of a disability, however, plaintiff must once again show that he

had a record of being substantially limited in one or more major life activities. 29 C.F.R. § 1630.2(k); Kampmier v. Emeritus Corp., 472 F.3d 930, 938 (7th Cir. 2007), citing Rooney, 410 F.3d at 381. Because plaintiff has not done so, he cannot establish that he had a record of a disability.

Plaintiff has also not established that defendant regarded him as having a disability under 29 U.S.C. § 12102(2)(C). A plaintiff is regarded as having a disability by his employer "when the employer, rightly or wrongly, believes that [he] has an impairment that substantially limits one or more major life activities." Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331, 335 (7th Cir. 2004). "If 'the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute.'" Kampmier, 472 F.3d at 938, citing Mack v. Great Dane Trailers, 308 F.3d 776, 782 (7th Cir. 2002). As discussed above, plaintiff was not substantially limited in any major life activity due to his back injury. Further, plaintiff has provided no evidence that defendant viewed plaintiff as substantially limited in any major life activity. Defendant never altered plaintiff's job responsibilities after learning of his back injuries and continued to provide him with assignments in the warehouse that involved heavy lifting. If anything, defendant believed that plaintiff was incapable of lifting heavy items, which does not rise to the level of a substantial limitation in the major life activity of working. Further, there is evidence that many employees of defendant, including supervisors with authority over plaintiff, believed that plaintiff was "faking" his injuries. Finally, plaintiff has offered no evidence that anyone in authority at his employer regarded plaintiff as being unable to perform a broad class of jobs. Plaintiff has therefore not established that defendant regarded him as having a disability.

Plaintiff has not met the first prong of his prima facie case because he cannot establish that he has a disability under the ADA. Even if plaintiff could meet this prong, however, his prima facie case fails because he cannot prove that he was working up to defendant's legitimate employment expectations. Defendant has provided extensive documentation of plaintiff's numerous mispicks, mislabeling, failure to use proper keying procedure, and sleeping on the job. Although plaintiff disputes some portion of his disciplinary record, he admits to a large percentage of it. Further, it is uncontested that plaintiff's attendance was not up to defendant's expectations. "[I]n most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs." Waggoner, 169 F.3d 484. As noted above, plaintiff worked full days on Monday through Thursday only five times from June 4, 2001, to April of 2002, and he was on medical leave for weeks at a time. Based on both his disciplinary record and his attendance record, plaintiff was not meeting defendant's legitimate employment expectations and cannot satisfy this prong of his prima facie case.

Finally, even if plaintiff had met every other prong, he cannot demonstrate that other similarly situated employees were treated in the same manner. Plaintiff identified two employees, Bob Tisco and Steve Bach, who received light duty assignments as assemblers after suffering injuries in the warehouse. These employees, however, are not similarly situated, as they did not have the same history of disciplinary action and poor attendance. See, e.g., Haywood v. Lucent Techs., 323 F.3d 524, 529 (7th Cir. 2003) (summary judgment was proper because plaintiff "pointed to [no] evidence showing that the other two employees had a comparable set of failings"). Plaintiff also identified Jene Khazzoun, an employee who had

16

mispicks in the warehouse and was not terminated. Again, Khazzoun had mispicks on one day, rather than a history of errors, and he did not have a record of attendance problems. Because plaintiff cannot identify a single similarly situated employee who was not terminated, he fails to meet this prong of his prima facie case.

Finally, even assuming plaintiff met his burden and established all four prongs of his prima facie case, defendant has met its burden by providing a legitimate, non-discriminatory reason for his termination. To survive the motion for summary judgment, plaintiff is required to offer evidence that defendant's reasons for terminating him—his performance and his attendance record—were pretextual. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347-49 (7th Cir. 1997). Plaintiff has presented no evidence that defendant's reason for terminating him was false. In fact, plaintiff has conceded that he had a history of poor performance and was frequently absent from work. Plaintiff can therefore not show that defendant's proffered reason is pretextual.

Because plaintiff cannot meet three of the four prongs of his prima facie case, and because defendant has provided a legitimate, non-discriminatory reason for plaintiff's termination, the court grants defendant's motion as to Counts II and III.

Count I: Failure to Accommodate

Count I of the complaint alleges that defendant failed to accommodate plaintiff as required under the ADA. Under the statute, "an employer must make 'reasonable accommodations' to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an 'undue hardship.'" 42 U.S.C. § 12112(b)(5)(A); EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 802 (7th Cir. 2005). To establish a prima facie claim for failure to

accommodate, plaintiff must show that: (1) he is a qualified person with a disability; (2) the employer was aware of the disability; and (3) the employer failed to provide a reasonable accommodation for the disability. Id. at 797. Because, as discussed above, plaintiff has failed to establish that he has a disability under the ADA, plaintiff fails to establish his prima facie case for failure to accommodate. The court therefore grants defendant's motion as to Count I.

### CONCLUSION

For the reasons stated above, the court grants the motion for summary judgment.[7]

**ENTER: February 20, 2007**

_____
**Robert W. Gettleman
United States District Judge**

---

[7]The court expresses its appreciation to G. Terence Nader, Norman Finkel and William Klein of Schoenberg, Finkel, Newman & Rosenberg, LLC, who have ably represented plaintiff as appointed counsel under L.R. 83.11(g).